Not Reported in A.2d                                                                Page 10
(Cite as: 1994 WL 700344 (Conn.Super.))

defendants for a protective order is that such an order is necessary to protect the right and opportunity of each of the defendants to obtain a fair trial by jury. The evidence was that this case, and the plaintiff's allegations, have received significant and responsible media coverage. Yet, the media coverage which those allegations have received may pale in comparison to the exposure which the products of pretrial discovery would yield. Not inappropriately, much of that information would be republished or rebroadcast by the media prior to trial. Such exposure may well have a salutary effect, as the plaintiff claims, but that is not the purpose of pretrial discovery. *Joy v. North,* supra, 692 F.2d 893. Such pretrial media exposure of a case such as this indeed could impair the rights of the parties to receive a fair trial. *State v. Crafts,* 226 Conn. 237, 257-59, 627 A.2d 877 (1993); *State v. Townsend,* 211 Conn. 215, 225-26, 558 A.2d 669 (1989). It is, after all, the business of the Superior Court to provide private litigants an opportunity to adjust their grievances on their merits in a fair trial culminating in a final judgment. *Killingly v. Connecticut Siting Council,* 220 Conn. 516, 532, 600 A.2d 752 (1991); *Corey v. Avco-Lycoming Division,* 163 Conn. 309, 316-17, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699 (1972). A fair and impartial jury obtained from a fair cross section of the community, is an indispensable component of a fair jury trial. *State v. Castonguay,* 194 Conn. 416, 420, 481 A.2d 56 (1985); *State v. Townsend,* 167 Conn. 539, 551, 356 A.2d 12, cert. denied, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 62 (1975); see Conn. Constit., art. I, § 19; see also *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Edmondson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Martins v. Connecticut Light & Power Co.* 35 Conn.App. 212, 222-226, 645 A.2d 557, cert. denied, 231 Conn. 915, 648 A.2d 154 (1994). We should aspire to achieve as impartial a jury from as broad a cross-section of the community for the fairest trial possible. Where, as here, prophylactic measures may be timely employed, settling for the minimum in fairness ought not to be the goal of any court.

*7 "Even if the pending litigation is a matter of public interest rather than an ordinary dispute

between private litigants," Practice Book § 221 provides that a protective order may be issued "for good cause shown"; a higher standard, such as compelling cause, need not be satisfied. *Bowlen v. District Court,* 733 P.2d 1179, 1183 (Colo.1987). "A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements." (Authorities omitted.) *Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7-8 (1st Cir.1986).

Specific evidence of widespread media coverage was presented to the court. This court also takes judicial notice of media coverage of this case after the close of the evidence and at the end of the hearing, albeit not for the truth of the matters asserted therein. *Anderson v. Cryovac, Inc.,* supra, 805 F.2d 8; *State v. Boucher,* 207 Conn. 612, 615-616, 541 A.2d 865 (1988). The parties' right to a fair and impartial jury comprised of a fair cross section of the community, already problematical because of the classic collision between that right and the right, and necessity, for a free and open press, will become further imperiled unless that right is protected by an appropriate order of the court. For this good cause, and because edification of the public is not a proper purpose of pretrial discovery; *Joy v. North,* supra, 692 F.2d 893; the motion of defendants Diocese and Bishop Curtis for a protective order is granted, pursuant to Practice Book § 221 and *Seattle Times Co. v. Rhinehart,* supra, until further order of the court and with the caveat that it shall "not restrict the dissemination of the information if gained from other sources...." *Seattle Times Co. v. Rhinehart,* supra, 37. The text of that protective order is an addendum hereto.

In summary, the parties shall be permitted access to certain of the contents of the defendant Pcolka's personnel file, which has been examined by the court in camera, and the defendants' motions for a protective order with respect to personnel files other than that of Pcolka and with respect to the disclosure of information and documents obtained by way of pretrial discovery from any of the defendants or from Bishop Eagan are granted.

ADDENDUM
PROTECTIVE ORDER

1. Until further order of the court, which order shall be made not later than the completion of jury selection, all information, documents and transcripts

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

which the parties may obtain through the depositions of the defendants, including persons designated pursuant to Practice Book § 244(g), [FN6] and Bishop Edward Eagan shall not be disseminated, shown, disclosed, divulged or transmitted by any one to any person or organization other than the parties to this lawsuit and their respective attorneys and to any investigators and potential expert witnesses retained by the parties to this lawsuit or their attorneys and stenographic personnel with a need and obligation to see and receive the same, PROVIDED, that no such information or document shall be disseminated, shown, disclosed, divulged or transmitted to any person whatsoever, other than to the parties and their attorneys, unless and until such other person first is shown a copy of this protective order, reads it, agrees to be bound by its terms and to the terms of any order supplementing this order, and signifies his or her agreement by signing both pages of this order.

FN6. Practice Book § 244(g) provides: "A party may in the notice [of deposition] and in his subpoena name as the deponent a public or private corporation or a partnership or an association or a governmental agency or a state officer in an action arising out of the officer's performance of employment and designate with reasonable particularity the matters on which examination is requested. The organization or state officer so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated shall testify as to matters known or reasonably available to the organization. This paragraph does not preclude the taking of a deposition by any other procedure authorized by the Practice Book."

*8 2. All such documents and transcripts which the attorneys representing any of the parties believe in good faith may be entitled to protection from disclosure after the completion of jury selection, shall be marked "CONFIDENTIAL: SUBJECT TO COURT ORDER" and shall be submitted to the court for review and appropriate order before being released from the protection afforded by this order.

3. Whenever any pleading, document or motion referencing, incorporating or attaching any documents described in paragraph one of this order is filed with the court or delivered to any judge thereof, it shall be filed or delivered under seal pending review by the court or judge and shall be marked by the party filing or delivering same "CONFIDENTIAL: SUBJECT TO COURT ORDER".

1994 WL 700344 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

39

1    sergeant?

2        A.    I don't believe so.

3        Q.    Does it go back to the time when you were

4    a lieutenant?

5        A.    Possibly.

6        Q.    So let me understand what kinds of things

7    you would put in there.  You would put things in there

8    that might otherwise be a bad mark in a personnel

9    file, but you keep it to yourself in your computer and

10   you know about it but nobody else does.  Is that

11   basically what has been happening here?

12                MS. SPINELLA:  I'm going to object

13            to that question.

14                MR. RENZULLO:  I'll rephrase

15            it.

16   BY MR. RENZULLO:

17        Q.    What's in there?  Describe what you put

18   in there other than a memo like this one dated -- like

19   Plaintiff's Exhibit A.

20        A.    My computer has grievances.  It has --

21        Q.    I'm not asking what's in your computer,

22   only in that secure portion of your computer that no

23   one else can access.

24        A.    That's it.  It would include

25   grievances --

A+ REPORTING SERVICES

40

1      Q.    By whom?

2      A.    By our union, both dispatch and control.

3            It would include assignments of internal

4 affairs investigation.

5      Q.    Such as --

6      A.    Any internal affairs investigation that I

7 receive that I assign to an officer.

8      Q.    How does that differ from this complaint

9 of -- of Plaintiff's Exhibit C?  Is that in there too?

10      A.    This is part of our in-house computer

11 dispatch system.

12      Q.    What I'm trying to determine, sir, is if

13 the records, the general records, show a complaint as

14 having been referred to IA, is that kind of a

15 complaint also in your secure part of your computer

16 only more detailed?

17      A.    It would be the notice to the supervisor

18 that's going to be conducting the IA.  In other words,

19 I should have a memo -- I can't say so for this one,

20 because I don't know if I did it in every case.

21 Sometimes it's a verbal statement to a supervisor, You

22 are now being assigned.

23            But as we become accredited, we are

24 trying to be more detail orientated.  I now try and do

25 a memo to a supervisor saying you are being assigned

41

1    to this.

2           Q.      Does it contain any particulars of the

3    complaint?

4           A.      Generally not.

5           Q.      Why is it necessary that you keep that in

6    your private sector of the computer?  What is so

7    private about that sort of memo?

8           A.      Only because if it's on the network that

9    would mean any officer can sit back and read it at any

10   time, and if the officer is the target of the IA, we

11   wouldn't want them to be reading about that until they

12   are notified; and we may not want the rest of the

13   department notified either.

14          Q.      That there's an IA investigation?

15          A.      Correct.

16          Q.      So you don't want one officer to know

17   that another officer is being investigated?

18          A.      Depending on the nature of the complaint,

19   we may need to keep them as independent parties.

20          Q.      So it might not be unusual that one

21   officer doesn't know another officer is having all

22   kinds of complaints against him?

23          A.      Correct.

24          Q.      Other than a memo such as the February

25   16, 2000, and your memorandum referring complaints to

A+ REPORTING SERVICES

42

1   IA, what other sort of things are in the private

2   section of your computer?

3           A.      Draft revisions of general orders.

4           Q.      Why would that be a -- something

5   requiring privacy?

6           A.      It does not.  Just the way it's

7   configured, sir.

8           Q.      What else would be in this private

9   section of your computer?

10          A.      I have a folder that's entitled

11  "Emergency Medical Services."  I have folders that are

12  entitled "For North Central Emergency Services Team."

13  It's basically the C drive of the computer.

14          Q.      Why is it necessary that those things

15  only be accessible by you and be privileged to you?

16          A.      A matter of convenience, sir.

17          Q.      Now, Chief, one of the IA reports

18  contains some statistics regarding arrest data.  Can

19  you tell me whether or not your department maintains

20  records as to arrest data, the number of arrests, for

21  instance --

22          A.      Yes.

23          Q.      -- how many of them are motor vehicle

24  cases?

25          A.      Yes.

50

1    Q.    But you believe he does?

2    A.    I don't know what he has.

3    Q.    And you never looked?

4    A.    Correct.

5    Q.    And you never asked?

6    A.    True.

7    Q.    Did you ask him if he had any secure --

8    A.    I never did.  That's why I said true,

9    sir.

10    Q.    I have to go over this again.  Why is it

11    you find it necessary to keep memos such as

12    Plaintiff's Exhibit A in your own secure portion of

13    your computer and not in the personnel file of the

14    officer?

15                MS. SPINELLA:  I think he's

16            answered that question already

17            several times.

18                MR. RENZULLO:  I'll withdraw

19            it.

20    BY MR. RENZULLO:

21    Q.    So it's your testimony that memoranda

22    such as this -- Is this the only memorandum that you

23    have regarding an officer's alleged misconduct in your

24    computer, or do you have such memoranda regarding

25    other officers as well as Clark?

51

1        A.      I believe I have others as well, sir.

2        Q.      About how many would you say you have,

3     sir?

4        A.      I don't know.

5        Q.      How many years have you been collecting

6     these?

7        A.      Again, I don't know a specific time

8     frame.

9        Q.      Do you think that collecting these has

10    any -- is of any help to you in your dealings with

11    subordinates?

12       A.      I believe it does when I'm looking to do

13    their annual evaluation.

14       Q.      So if they complain about their

15    evaluation, you can say, Well, remember that incident;

16    I wrote this memo and we went over it?

17       A.      Yes, sir.

18       Q.      Is that what you use it for?

19       A.      Primarily.  My memory is not the best in

20    the world.  I use a memo to do that.

21       Q.      How often would you say you've done that?

22       A.      I don't know.

23       Q.      With regard to how many officers would

24    you say?  More than a dozen?

25       A.      Are you asking that they've had a

A+ REPORTING SERVICES

52

 1    complaint with their evaluation and --

 2         Q.    And you used some kind of memo or

 3    notation that you had in your secured computer.

 4         A.    Probably never.

 5         Q.    So this was the only time you ever used a

 6    memo or kept a memo --

 7         A.    I've kept memos.

 8         Q.    Right.  You said you kept memos, but you

 9    don't know how many.

10         A.    Yes.

11         Q.    And you said you've used them regularly

12    in -- I don't want to put words in your mouth --

13         A.    I've used them infrequently.

14         Q.    But over the years since you've been

15    lieutenant?

16         A.    Yes.

17         Q.    And you use them when necessary?

18         A.    Yes, sir.

19         Q.    And when do you consider them to be

20    necessary?

21         A.    When I think it's something that I want

22    to be able to have a remembrance of at a later date.

23         Q.    Well, what sort of things would you want

24    to have a remembrance of at a later date?

25         A.    Anything that I might want to bring to an

53

1    officer's attention at the evaluation.   If it happens

2    at the beginning of the year, I may not remember in

3    December or January.

4           Q.    So it's for the purpose of improving the

5    officer?

6           A.    Yes, sir.

7           Q.    So in December of 2000, did you, again,

8    counsel Clark?

9           A.    Actually, I don't believe I did his

10   evaluation that year.

11          Q.    Who did?

12          A.    I don't know, sir.

13          Q.    Is that a record of your department, who

14   did the evaluation?

15          A.    Yes.

16          Q.    Who keeps the records of the evaluation?

17          A.    Finance department.

18          Q.    So when I request copies of materials

19   regarding Officer Clark, Officer Castle, are you

20   telling me if I didn't request them of your finance

21   department or some general department of the Town, I

22   don't get them?

23          A.    No, sir.

24          Q.    They are not accessible to you?

25          A.    They are accessible, and I provided the

54

1    ones that you asked for, sir.

2         Q.    Well, I don't have all the records

3    related to Officer Clark, do I?  You didn't provide

4    all them in the disclosure because some are elsewhere

5    in the Town, aren't they?

6         A.    I'm not sure which you asked for and what

7    we provided.  I know we provided all the ones that you

8    asked for.

9         Q.    Is either a portion of Officer Castle or

10   Officer Clark's personnel file located outside of your

11   department?

12        A.    All their personnel file is located

13   outside of the department.

14        Q.    So are you testifying that you provided

15   everything that -- Whether in your department or

16   outside of your department, you provided whatever is

17   in their personnel file?

18        A.    I provided it whether it was in or out of

19   the department.  All the documents that you requested.

20        Q.    Are you telling me that there are

21   documents -- whether or not I requested it, there are

22   additional documents in the town of Granby in the

23   personnel files of either Officer Castle or Officer

24   Clark that have not been provided?

25        A.    That's probably true, yes.

ANSWER:

Sergeant Kevin Bennett.  A file cabinet located within
the Shift Supervisor's Office.

43.  Does the Town of Granby, its police department, or any of its employees keep or
maintain a personnel file or records regarding defendant Clark and defendant Castle?

ANSWER:

Yes

44.  If the answer to No. 43 above is in the affirmative, who has custody of such file or
records and where are they located?

ANSWER:

Mrs. Barbarajean Scibelli
Town of Granby Finance Officer
ISB North Granby Road
Granby, CT

45.  After the inclusion of any entry into such personnel file or records, was any such
entry ever expunged for either defendant Clark or defendant Castle?

ANSWER:

Officer Clark:

Yes

Officer Castle:

No

SILVESTER & DALY
72 RUSS STREET  •  HARTFORD, CONNECTICUT 06106  •  (860) 278-2650  •  FAX (860) 727-9243

9.  Any written or printed document, memorandum or paper with respect to Interrogatories No. 39 and 40.

ANSWER:

See attached

10. Any written or printed document, memorandum or paper setting forth any violation of department rules, guidelines or policies in the personnel records of defendant Clark and defendant Castle.

ANSWER:

See attached

THE DEFENDANTS,
TOWN OF GRANBY, DOUGLAS CLARK
and ROBERT CASTLE

By:_____

JOSEPHINE A. SPINELLA
Silvester & Daly
72 Russ Street
Hartford, CT 06103
Tel. (860) 278-2650
Federal Bar No. CT24009

34

1    Q.    How many?

2    A.    I don't know, sir.

3    Q.    And no one can examine these except you;

4  is that correct, Chief?

5    A.    I disagree.  You asked for a document

6  that you would not have otherwise had record of and I

7  provided it.

8    Q.    Except I'm relying on you providing it

9  and there's no way to check if you are providing them

10  all; isn't that correct, Chief?

11    A.    I will invite you to look through my

12  computer.

13    Q.    And how would I know something wasn't

14  erased?

15    A.    I don't know, sir.

16    Q.    If I looked through your computer how

17  would I know that something just may have been deleted

18  unintentionally?  How would you know?

19    A.    I don't know.

20    Q.    Do you backup your computer?

21    A.    Yes.

22    Q.    How often?

23    A.    I believe daily.

24    Q.    Do you keep diskettes or disks or some

25  kind of electronic media to record the backup?

A+ REPORTING SERVICES

31

1     Q.    Once again, it was not referred in

2     writing?

3           A.    Yes, sir, it was, sir.  Unless we are

4     talking two different things.

5           Q.    I want to understand.  This report is a

6     report of the IA officer, correct?

7           A.    That's correct, sir.

8           Q.    So the referral is made by her?

9           A.    Yes.

10          Q.    Now, you are approving the report?

11          A.    Yes.

12          Q.    But as a supervisor, you are taking no

13    action with regard to imposing any additional training

14    or counseling upon Officer Clark; is that correct?

15          A.    Yes.

16          Q.    And is it your testimony that the reason

17    why you wouldn't do that is because that was the

18    chief's job at that time?  Is that your position?

19          A.    Yes, sir.

20          Q.    And the only reason you did anything in

21    February was because you are trying to help an officer

22    keep a problem down and out of his personnel file?

23          A.    No, sir.  Not for that reason at all.

24          Q.    Why did you write that memo in February

25    and not put it in his personnel file?

A+ REPORTING SERVICES

32

1    A.    The memo was to myself.   The purpose of

2    it was to sit back and keep a good officer doing a

3    good job, and bring to his attention a concern that a

4    member of the public brought to mine.

5    Q.    Did you feel any obligation to the public

6    to put it in his personnel file?

7    A.    At that time I did not.

8    Q.    Did you feel an obligation to the public

9    at some time later to put it in his personnel file?

10    A.    No, sir.

11    Q.    Did you feel an obligation after the

12    Janeski complaint?

13    A.    To put the first document -- the file

14    memo into his file?

15    Q.    Yes.

16    A.    No, sir.

17    Q.    Did you feel an obligation to advise the

18    chief of the problem with Mr. Perry at any time after

19    you knew these other incidents had taken place?

20    A.    I believe I would have brought it to

21    Chief Marron's attention.   I don't recall when.

22    Q.    You have access to Chief Marron's

23    records?

24    A.    No.

25    Q.    Why not?